IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

FRANK PITTELLI                          )
and KRISTI PAMBIANCO,                    )
                                        )
            Plaintiffs,                  )   TC-MD 130146N
                                        )
      v.                                 )
                                        )
WASHINGTON COUNTY ASSESSOR,              )
                                        )
            Defendant.                   )   **FINAL DECISION**

The court entered its Decision in the above-entitled matter on December 31, 2013. The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered. The court's Final Decision incorporates its Decision without change.

Plaintiffs appeal the real market value of property identified as Account R2147313 (subject property) for the 2012-13 tax year. A trial was held in the Oregon Tax Courtroom on October 30, 2013. Plaintiff Kristi Pambianco (Pambianco) appeared and testified on behalf of Plaintiffs. John Hartwell (Hartwell), owner of Hartwell Homes LLC, testified by telephone on behalf of Plaintiffs. Adrienne Wilkes, Residential Appraisal Supervisor, appeared on behalf of Defendant. Azure Olson (Olson), Property Appraiser II, testified on behalf of Defendant.

Plaintiffs' Exhibits 1 through 6 and 8 through 9 were admitted without objection. Plaintiffs' Exhibit 7, documents provided before the board of property tax appeals (BOPTA), was admitted over Defendant's objection to its relevance. Defendant objected to Plaintiffs' Exhibit 10, a printout from the website appraisersforum.com, and the court excluded that exhibit. Defendant's Exhibit A, with Appendices A through D, were admitted with corrections to pages five and 35 of Exhibit A. Plaintiff objected to the relevance of Defendant's Appendix C to

Exhibit A, an appraisal of the subject property prepared for lending purposes on March 23, 2011. The court allowed the appendix, noting the objection would be considered in weighing the evidence. The parties filed written closing arguments and this matter is now ready for decision.

## I. STATEMENT OF FACTS

Pambianco testified that the subject property is a two-story, custom home built by Hartwell Homes situated on a sloped, in-filled 0.23-acre lot in the Cedar Mill area, northwest of downtown Portland. (*See* Ptfs' Ex 1 at 3-4.) She testified that the subject property home was constructed in 2011 and Plaintiffs moved into the home on October 31, 2011. (*See id.* at 4.) The parties disagree on the subject property's size. Pambianco determined the subject property was 3,992 square feet based on the building specifications. (Ptfs' Exs 1 at 4, 4 at 18.) Olson testified that she determined the subject property was 4,050 square feet by rounding the building plan figures. (*See* Def's Ex A at 18.)

Pambianco testified that the subject property includes four bedrooms, three and one-half bathrooms, a kitchen, a dining room, a family room, an office, a bonus room (playroom), and a two-car tandem garage. (*See* Ptfs' Ex 1 at 4.) She testified that four cars cannot fit in the garage due to the placement of the staircase. (*See* Ptfs' Ex 4 at 7.) Pambianco testified that the subject property's upstairs is "much more basic" than its downstairs. Plaintiffs provided a detailed list of the subject property's interior and exterior features. (Ptfs' Ex 1 at 4-5.)

The parties agree that the subject property's lot suffers from a "fish bowl effect" because the three homes to the north are situated higher on the slope and look down on the subject property. (*See* Ptfs' Exs 1 at 3, 2 at 5-7.) Pambianco testified that the subject property's lot is sloped and Plaintiffs paid to excavate the lot and create a level, grass area. (*See id.*) She testified that the subject property lot includes a 10-foot water easement on the west side as well as a

pedestrian path. (*See id.*) Olson testified that she agrees with Plaintiffs that the subject property's value is negatively impacted by the fish bowl effect and by the poorly maintained house across the street from the subject property. (*See* Ptfs' Ex 2 at 1-7.)

Pambianco testified that the subject property is located on NW Sunningdale Drive, a "narrow no outlet street" that, for the most part, lacks sidewalks.[1] (Ptfs' Ex 1 at 3.) She described the street as one with "homes built in the 1950s-70s" and inferior maintenance "to what is typically found in a family-oriented neighborhood or subdivision." (*Id.*) Olson described the subject property's neighborhood as "non-homogenous" and testified that it includes homes ranging in value from $300,000 to over $1 million. (*See* Def's Ex A at 4.) Plaintiffs stated that

> "covenants, conditions, and restrictions exist on NW Sunningdale Drive which prohibit[] partitioning or other division of the existing lots. Neighborhood can[]not 'turn' and will remain inferior to those with homes of similar quality of subject property that reside in neighborhoods comprised of similarly priced homes with similar quality and appeal to buyers."

(Ptfs' Ex 1 at 7; *see also* Ptfs' Ex 2 at 8-31.) Olson testified that the Sunningdale neighborhood is desirable because it includes large lots ranging in size from 0.5 to 1.0 acre. She testified that she found only six sales of properties in the Sunningdale neighborhood in three years.

A.    *Construction Defects*

Pambianco testified that the custom cabinetry was provided by Red Hill Cabinetry. She testified that all of the subject property's cabinets and built-ins are losing their maple veneers through peeling and cracking. (*See* Ptfs' Exs 1 at 6, 2 at 54-61.) Pambianco testified that the problem appeared to be cheap, poor quality veneers. She testified that the cabinets and built-ins

/ / /

---

[1] Pambianco testified that, following completion of the subject property, sidewalks were installed in front of the subject property and the other Hartwell Homes property next door. (*See* Ptfs' Ex 1 at 3.)

were also affected by cracking wood in some places and by faulty slow-close mechanisms. (*See id.*)

Plaintiffs' construction contract included a $45,000 cabinet allowance. (Ptfs' Ex 4 at 21.) Pambianco testified that she was told by several companies that the subject property's cabinetry and built-ins could not be repaired and would have to be replaced at a likely cost of $40,000. (*See* Ptfs' Ex 1 at 6.) Plaintiffs provided a letter from Refinish First LLP stating that, due to the nature of the damage, the cabinets could not be repaired by "a simple refacing * * * [or by] refinishing or painting * * *." (Ptfs' Ex 2 at 35.) Plaintiffs provided a quote for new cabinetry from Red Hills Custom Cabinets for $41,311. (Ptfs' Ex 2 at 38.)

Pambianco testified that the subject property's garage doors are mahogany with overlays and were damaged by water intrusion "immediately after installation." (*See* Ptfs' Exs 1 at 6, 2 at 50-53.) Plaintiffs explained that the garage

> "[d]oors have visible water damage and panels are buckling. [Two] garage door companies * * * inspected doors and said that once initial water soaked into wood the doors were finished and need to be replaced. There is no repair remedy. Cost of original doors was [$4,000] plus painting and mahogany wood overlay costs. Cost to remove existing doors and replace is $7,600."

(Ptfs' Ex 1 at 6.) Pambianco testified that the manufacturer confirmed that the seals on the garage doors were not properly installed and, at the time the seals were installed, the water damage had already occurred so resealing or repairing would not resolve the damage. Plaintiffs provided a quote totaling $11,700 for installation and all hardware necessary for garage doors comparable to the subject property's garage doors. (Ptfs' Ex 2 at 36.)

Defendant "recognizes there were material defects in the construction of the [subject] property limited to built-in cabinetry and the mahogany garage doors. [Defendant] estimate[s]

///

the cost-to-cure these defects to be $30,000 based on a combination of evidence from [Pambianco] and testimony from * * * Hartwell[.]" (Def's Closing Arg at 1-2.)

B.    *Cost Approach*

Plaintiffs did not use the cost approach because the "replacement cost of a property[,]" is not the amount a buyer is willing to pay. (Ptfs' Ex 1 at 16.) Plaintiffs further state that they

> "built on the lot because the lot was purchased * * * in 2008 before the real estate market crashed. Cost approach does not reflect buyer's actions in a market with existing home prices declining, high volume of short sales/foreclosures, heightened cost of materials due to low demand as new construction halted, higher costs due to high oil prices. Builders were selling new construction below cost at this time in the real estate market."

(*Id.*) Olson used the cost approach and determined the subject property's total cost new was $763,447 using "Marshall and Swift Building Cost Data." (Def's Ex A at 34.)

1.    *Plaintiffs' actual costs*

Plaintiffs purchased the subject property land in June 2008 for $244,000 with a seller credit of $5,588. (Ptfs' Ex 4 at 25.) Pambianco testified that Plaintiffs did not look at many lots before purchasing the subject property land because not many lots in the Cedar Mill area were on the market at that time. She testified that Plaintiffs wanted a lot in the Cedar Mill area with sufficient space for a yard for their children. Plaintiffs' contract price for the construction of the subject property was $547,310. (Ptfs' Ex 4 at 22, 24.) Plaintiffs' contract for the subject property construction included site developments costs, such as sewer connections, excavation, fill, electric utility connections, a rear retaining wall, walkways, and landscaping. (*Id.* at 23-24.) Pambianco testified that Plaintiffs did not pay for any overages or upgrades, although they paid $2,000 for an excavation change order.

/ / /

/ / /

2.    *Land and onsite developments*

Plaintiffs provided a list of vacant lots ranging in size from 0.17 to 0.50 acres that sold between February 2010 and December 2012. (Ptfs' Ex 6 at 1.) The lot sale prices ranged from $129,900 to $215,000, with one 0.36-acre lot in a "superior" location with views, which sold for $260,000 in November 2010. (*Id.*) Two of Plaintiffs' land sales were used in the March 2011 lending appraisal of the subject property: a 0.21-acre lot that sold for $185,000 in February 2010 and a 0.34-acre lot that sold for $215,000 in April 2011. (Ptfs' Ex 6 at 1; Def's Ex A, Appendix C at 75.)

Under her cost approach, Olson determined a value of $200,000 for the subject property land as vacant and made a downward adjustment of $10,000 for the "location/fishbowl." (Def's Ex A at 34.) She testified that she relied on the site value conclusion of $200,000 in the March 2011 lending appraisal of the subject property. (*See* Def's Ex A, Appendix C at 65-66.) Olson added onsite development costs of $29,800, for a total land value of $219,800 under the cost approach. (Def's Ex A at 34.) Elsewhere in her report, Olson recommended a land value of $213,000 for the subject property land. (*Id.* at 1.) Her report included no analysis or supporting evidence for either land value conclusion other than the March 2011 lending appraisal of the subject property.

3.    *Improvements*

Olson testified that, using Marshall and Swift, she determined a price of $115 per square-foot and made both regional and local adjustments for a cost new of $543,647 for the subject property's improvements. (*See* Def's Ex A at 34.) She added a land value of $190,000 and onsite development costs of $29,800 for a total cost new of $763,447. (*Id.*)

/ / /

C.      *Sales Comparison Approach*

Pambianco testified that she is not an appraiser, but she has 20 years experience in marketing and market research. She testified that, in preparation for this appeal, she met with a realtor to identify comparable sales and consulted with an appraiser to understand how to make adjustments. Pambianco testified that she identified 17 comparable sales, but she focused at trial on her top five comparable sales. She described her top five sales as "custom built traditional style homes with high end finishes inside and out." (Ptfs' Ltr at 1, Dec 2, 2013.) Pambianco testified that all five were newer properties and three of the five were built in 2011. She testified that she gathered information from the regional multiple listing service (RMLS) and from property tax records. Pambianco testified that she viewed the interiors of some of her sales, but did not verify any.

Pambianco testified that all of her sales, except for sale 16, were located in the Cedar Mill area within three miles of the subject property and all sold between January 2011 and July 2012. (*See* Ptfs' Ex 1 at 16.) She testified that she made adjustments for differences from the subject property, including location, land size/details and view, time (for 2011 sales), size, and year built. (*Id.* at 16-22.) Pambianco adjusted $61 per square-foot for "the main floor living area" and $50 per square-foot for the "upper and finished lower levels." (*Id.* at 17.) She stated those adjustments were "in line with [Defendant's] numbers at [the] BOPTA appeal." (*Id.*) Pambianco adjusted $25 per square-foot for "below grade unfinished basement area" and $35 per square-foot for "above grade unfinished areas." (*Id.*) She adjusted for each additional garage bay, bedroom, bathroom, and fireplace. (*Id.* at 18-22.) Pambianco made a $25,000 downward adjustment to all of her comparable sales for built-ins, based on defects with the subject property's cabinets and built-ins. (*Id.* at 18-22.)

The unadjusted prices of Pambianco's top five sales ranged from $569,900 to $639,999, or $139 to $165 per square-foot. (Ptfs' Ex 1 at 18-22.) For each of her sales, Pambianco noted the indicated value for the subject property based on the unadjusted price per square-foot. (*Id.*) The indicated values based on unadjusted price per square-foot ranged from $555,891.21 to $659,623.31. (*Id.*) Pambianco made net downward adjustments to each of her top five sales, resulting in adjusted prices ranging from $511,318 to $572,206. (*Id.*)

Pambianco's first two comparable sales were both houses built in 2011 and located on SW Taylor Street, 2.6 miles from the subject property. (Ptfs' Ex 1 at 18-19.) Sale 1 was a 3,602 square-foot house that sold for $570,000 in May 2011. (*Id.* at 18.) Pambianco testified that sale 1 had similar curb appeal as the subject property, but more privacy. Sale 1 included five bedrooms, three bathrooms, two fireplaces, a wetbar, and a three car "side by side" garage. (*Id.*) Pambianco determined an adjusted price of $519,269 for sale 1. (*Id.*) Sale 2 was a 3,449 square-foot house that sold for $569,900 in June 2011. (*Id.* at 19.) Pambianco testified that sale 2 had a similar kitchen to the subject property, except it included stained wood rather than veneers. Sale 2 included five bedrooms, three bathrooms, two fireplaces, a wetbar, and a three car "side by side" garage. (*Id.*) Pambianco determined an adjusted price of $518,297 for sale 2. (*Id.*)

Pambianco's third comparable sale was a 4,596 square-foot house built in 2004 and located on NW Zermatt Court, 1.6 miles from the subject property, that sold for $639,999 in April 2012. (Ptfs' Ex 1 at 20.) Sale 3 included five bedrooms, four bathrooms, four fireplaces, a wetbar, and a three car "side by side" garage. (*Id.*) Pambianco testified that sale 3 was overall superior to the subject property and included a superior tile roof, for which she made a $10,000 downward adjustment. (*See id.*) She testified that sale 3 included superior landscaping and a covered patio, two decks, retaining walls, and a paver patio. (*See id.*) Pambianco made a

$10,000 downward adjustment for superior landscaping and a $7,500 downward adjustment for other yard and patio features. (*Id.*) She determined an adjusted price of $511,318 for sale 3. (*Id.*)

Pambianco's fourth comparable sale was a 3,917 square-foot house built in 2008 and located on NW Jordan Lane, 1.5 miles from the subject property, that sold for $580,000 in June 2012. (Ptfs' Ex 1 at 21.) Sale 4 included four bedrooms, 3.1 bathrooms, two fireplaces, and a two car "with tandem" garage. (*Id.*) Pambianco testified that sale 4 abuts the Tualatin Hills Park including 18 acres of preserved green space with jogging trials, a soccer field, a playground, and other amenities. (*See id.*) She made a $10,000 downward adjustment for that location and an additional $10,000 downward adjustment for superior land details and views. (*Id.*) Pambianco determined an adjusted price of $540,900 for sale 4. (*Id.*)

Pambianco's fifth comparable sale was a 4,002 square-foot house built in 2011 and located on NW Eggers Court, 1.4 miles from the subject property, that sold for $626,500 in June 2012. (Ptfs' Ex 1 at 22.) Sale 5 included four bedrooms, three bathrooms, two fireplaces, and a two car oversized garage. (*Id.*) Pambianco testified that sale 5 also included an outdoor kitchen and fireplace, for which she made a $10,000 downward adjustment. (*See id.*) She testified that sale 5 is located very close to the subject property on a street that has "turned" with the exception of one house. Pambianco determined an adjusted price of $572,206 for sale 5. (*Id.*)

Olson testified that she did not use any of Pambianco's top five sales in her comparable sales analysis. Olson testified that the two properties on SW Taylor Street were both spec homes – homes that the builder constructed without confirmed buyers – and she considered the quality to be inferior to the subject property. Olson testified that, according to the deed, sale 3 on Zermatt Court sold for $700,568. She testified that the house on Zermatt Court was another spec

home on a steep lot, which is the reason for the numerous retaining walls. Olson testified that sale 4 on NW Jordan Lane included a 0.14-acre lot, not a 0.20-acre lot as Pambianco reported. She testified that the property on NW Jordan Lane lacked the curb appeal of the subject property. Olson testified that sale 5 on Eggers Court was also a spec home and she could find no interior photos to compare the quality of sale 5 to the subject property.

Although she did not include them as comparable sales, Pambianco testified that two houses on the subject property's street sold in 2011 and 2012: a 3,242 square-foot house built in 1961 sold for $475,000 in November 2011 and a 4,057 square-foot house built in 1968 sold for $579,000 in July 2012. (*See* Ptfs' Ex 3 at 6-7.) She testified that a 2,216 square-foot house built in 1963 was listed at $420,000. (*See* Ptfs' Ex 3 at 4.)

Olson selected comparable properties that sold close to the January 1, 2012, assessment date and found that the sales indicated a total real market value of $715,000, not including any cost to cure. (Def's Ex A at 18.) Olson testified that her sales were all arm's-length, market transactions. She testified that she did not stay within the Cedar Mill area because there were not enough sales close to January 1, 2012. Olson made adjustments to her sales, including a gross living area adjustment of $55 to $56 per square-foot, an age adjustment of $5,000 per year, a garage adjustment, a downward time adjustment for 2011 sales, and adjustments for land details and size. (*Id.*) Olson testified that her adjustments were based on industry standards. She testified that Defendant conducts annual studies of factors affecting value to determine its industry standard adjustments. No studies were provided as exhibits.

Olson's first two sales were spec homes built by Hartwell Homes. (Def's Ex A at 18; Def's Closing Arg at 3.) Sale 1 was a 4,429 square-foot house built in 2005 located on NW Damascus Street that sold for $725,000 in November 2011. (Def's Ex A at 18.) Sale 1 included

four bathrooms, two fireplaces, and a 710 square-foot three car garage. (*Id.*) Olson made a net downward adjustment of $13,850 for an adjusted price of $711,150. (*Id.*) Olson testified that sale 1 was of similar quality to the subject property. She testified sale 1 included a superior 50-year roof, but the living room lacked built-ins. Olson testified that the interior of sale 1 was overall inferior to that of the subject property, but the exterior was superior.

Sale 2 was a 4,370 square-foot house built in 2007 and located on NW Lee Street that sold for $695,000 in February 2012. (Def's Ex A at 18.) Sale 2 included three and one-half bathrooms, two fireplaces, and a 940 square-foot three car garage. (*Id.*) Olson made a net upward adjustment of $29,000 for an adjusted price of $724,000. (*Id.*) She testified that sale 2 is in a similar location to the subject property, but has territorial views. Olson testified that the exterior of sale 2 is similar to that of the subject property, but the interior is inferior. She testified that, for example, sale 2 lacks the wainscoting and box beam ceilings of the subject property. Olson testified that the kitchen in sale 2 includes hickory hardwood custom cabinets, but they are what she would consider basic. She testified that she did not make land adjustments to her first two sales due to a "flag lot feel" associated with the lots and because of slight a fish bowl problem with sale 2.

Hartwell testified that sale 1 on Damascus Street started as a spec home, but included some custom finishes. He testified that sale 2 on Lee Street was a spec home. Hartwell testified that a custom home, such as the subject property, is one built per the owner's specifications. He testified that with a custom home, the buyer has probably seen other custom homes by the builder and likes the quality, style, and finishes used by that builder. Hartwell testified that with a spec home, the builder purchases a lot and constructs a home that the builder hopes will be appealing to a buyer. He testified that he typically uses the same finishing crew for both his

custom and spec homes. Hartwell testified that he tries to maximize profit, but he also tries to maintain a high quality level.

Hartwell testified regarding specific features of the Lee and Damascus Streets properties, comparing and contrasting them with the subject property. He testified that he considered the quality of construction of those two properties overall comparable to the subject property. Hartwell testified that if the subject property's cabinetry had turned out as planned, it would have been superior to that in the Lee and Damascus Streets properties. He testified that the subject property is less voluminous than the Lee and Damascus Streets properties, but all three are high quality. Pambianco testified that the Lee Street property sold new in 2010 to its first owner. Hartwell testified that the Lee Street property was in nearly new condition at the time of sale in 2012.

Hartwell testified that the Lee Street lot was not officially a flag lot, but included a private driveway with an easement. He testified that the Lee Street lot is not quite a fish bowl, but lacks privacy from the neighboring homes. Hartwell testified that, in his view, the Lee and Damascus Street neighborhoods have a similar appeal as the subject property's neighborhood.

Olson's third comparable sale was a 4,249 square-foot house built in 2006 and located on NW Oak Shadow Court that sold for $777,000 in August 2011. (Def's Ex A at 18.) Sale 3 included three full and two half bathrooms, two fireplaces, and a 1,284 square-foot four car garage. (*Id.*) Olson made a net downward adjustment of $63,940 for an adjusted price of $713,060. (*Id.*) She testified that the interior of sale 3 was of similar quality as the subject property. (*See id.*) Olson testified that the exterior of sale 3 was superior to that of the subject property, noting that it included a 50-year roof and was situated on a superior 0.35-acre lot. (*See id.*)

Olson's fourth comparable sale was a 3,804 square-foot house built in 2001 and located on NW Waker Drive that sold for $639,999 in October 2011. (Def's Ex A at 18.) Sale 4 included two and one-half bathrooms, two fireplaces, and a 651 square-foot three car garage. (*Id.*) Olson made a net upward adjustment of $74,600 for an adjusted price of $714,599. (*Id.*) She testified that sale 4 included a slightly inferior living room that lacked built-ins, but it included wainscoting on the stairs and cherry wood floors.

Olson testified that she gave more weight to sales 1 and 2, but considered sales 3 and 4 to provide support and bracketing. (*See id.*) In her view, sale 3 "illustrates the market premium that custom built homes demand." (Def's Closing Arg at 3.) She concluded a real market value of $715,000 for the subject property based on her sales comparison approach. (Def's Ex A at 18.)

D.      *Tax and Assessment Roll Values and Requested Real Market Values*

The 2012-13 tax roll real market value of the subject property was $768,930. (Ptfs' Compl at 2.) The 2012-13 exception real market value was $557,500, and the maximum assessed value was $603,940. (*Id.*) BOPTA reduced the 2012-13 real market value to $700,000, the exception value to $488,570, and the maximum assessed value to $545,280. (*Id.*) Plaintiffs initially requested a 2012-13 real market value of $615,000, but revised their requested value to $535,000 at trial. (*See id.* at 1.) Defendant initially determined a 2012-13 real market value of $715,000, but agreed to a reduction of $30,000 based on the evidence of defects presented at trial. (*See* Def's Ex A at 18; *see also* Def's Closing Arg at 1-2, 5.) Defendant requests a 2012-13 real market value of $685,000, with $472,000 allocated to the improvements, and a 2012-13 exception real market value of $484,980. (Def's Closing Arg at 5-6.)

/ / /

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2012-13 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches of value that must be considered are: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.* Both parties in this case relied on the sales comparison approach. Defendant also relied on the cost approach.

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing

differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7 (Mar 13, 2012). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

A.      *Cost Approach*

"In the cost approach, the value of a property is derived by adding the estimated value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.*, 19 OTR 51, 55 (2006) (citing Appraisal Institute, *The Appraisal of Real Estate* 63). "The cost approach is particularly useful in valuing new or nearly new improvements * * * [but] is less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Id.* (Internal citations omitted.) "[C]ost and market value can be more closely related when properties are new." *Anderson v. Lane County Assessor*, TC-MD 090298 at 6 (Nov 17, 2009).

Plaintiffs did not use the cost approach because, in their view, the sales comparison approach provides the best evidence of real market value. (Ptfs' Ltr at 5, Dec 2, 2013.) Defendant argues the cost approach "is perhaps the most appropriate means of valuing the newly constructed subject property, especially given the unique custom construction." (Def's Closing Arg at 2, citing *Watkins v. Dept. of Rev.*, 14 OTR at 229 (1997) (the cost approach is "generally accurate for new construction").) The subject property was new as of January 1, 2012, and the actual cost evidence provided by Plaintiffs' construction contract with Hartwell Homes is

detailed, thorough, and reliable. As a result the court finds that the cost approach provides persuasive evidence of the subject property's real market value as of January 1, 2012.

Olson determined that the subject property's land real market value, not including site developments, was $200,000 as of January 1, 2012. She made a downward adjustment of $10,000 due to the fish bowl problem. Olson did not include any analysis of land sales in her appraisal report and relied on the site value conclusion of the March 2011 lending appraisal of the subject property. Plaintiffs provided a list of unadjusted land sales, two of which were also used in the lending appraisal. Olson's bare land value conclusion of $190,000 is reasonable in light of the land sales presented by Plaintiffs and in light of Plaintiffs' June 2008 purchase of the subject property land for approximately $238,412.

Using Marshall and Swift, Olson concluded a cost of $543,647 for the subject property's improvements, which she noted was very close to the actual contract price of $547,310 for the subject property. Olson provided a one-page summary of her cost approach conclusions; she did not provide any supporting documents identifying the costs included in her improvements' cost conclusion. Olson added the improvements' cost to the adjusted land value of $190,000 and added onsite development costs of $29,800 for a total cost new of $763,447. Plaintiffs disagree with Olson's cost approach conclusion, noting that onsite development costs were included in the $547,310 contract price for construction of the subject property. Those contractual onsite development costs included:

> "site/land 'improvement' costs including excavation, debris removal, rear and front retaining walls, 2 rear French drains full length and width of property, permits, sidewalk and planter strip on county property, pavers, concrete (drive, walkways, back stoop), landscaping."

(Ptfs' Ltr at 5, Dec 2, 2013.)

/ / /

The court agrees with Plaintiffs that onsite development costs were included in the subject property's Hartwell Homes contract price. Under ORS 307.010(1)(a), the value of land includes any onsite developments. *See also* OAR 150-307.010(1)(2)(a)(A). The cost of onsite developments should be reallocated to the subject property's land real market value; it should not be separately added to the overall cost because it was already included in the actual contract price. The court finds that the cost approach indicates a total real market value of $737,310 as of January 1, 2012.

B.      *Sales Comparison Approach*

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). "The court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 *3.

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

OAR 150-308.205-(A)(2)(c).

Pambianco testified that she consulted with a realtor to identify comparable sales and with an appraiser to understand how to make adjustments. Some of Pambianco's adjustments are similar to those used by Olson. However, Pambianco is not a licensed appraiser or real estate broker. Pambianco testified that she did not verify any of her comparable sales, as is required under OAR 150-308.205-(A)(2)(c). Pambianco identified 17 sales as comparable, yet she made net downward adjustments to each of them. She failed, therefore, to bracket the subject property.

/ / /

Pambianco's real market value conclusion of $535,000 under the sales comparison approach does not make sense in light of other evidence presented. For example, Pambianco provided evidence of a property located on the same street as the subject property that sold for $579,000 in July 2012. That property was similar in size to the subject property, but built in 1968. Pambianco provided no explanation as to why a property built in 1968 would sell for $44,000 more than a similarly-sized and similarly-located custom home built in 2011.

Olson's comparable sales, especially her first two sales of properties built by Hartwell Homes, provide more persuasive evidence of the subject property's real market value. However, the court finds Olson's real market value conclusion of $715,000 is overstated for a few reasons. First, Olson determined the subject property was 4,050 square feet and made size adjustments accordingly. Plaintiffs presented persuasive evidence, including building plans, that the subject property was 3,992 square feet. Olson presented no evidence to support her determination that the subject property was 4,050 square feet. The court finds that the subject property was 3,992 square feet and, as a result, all of Olson's size adjustments are incorrect. Second, the court finds that Olson's $20,000 age adjustment to sale 2 was excessive in light of testimony from Hartwell and Pambianco that the property sold in new condition to its first owner in 2010. The court finds an adjustment of $10,000 is supported to reflect an effective age of 2009.

Accounting for those corrections to Olson's sales comparison approach, the court finds the sales comparison approach indicates a real market value of $710,000.

C.    *Cost to Cure and Reconciliation*

As discussed above, the court finds that the cost approach indicates a real market value of $737,310 and the sales comparison approach indicates a real market value $710,000. However, Plaintiffs presented persuasive evidence of defects in the subject property's built-in cabinetry and

garage doors supporting a cost to cure adjustment to the subject property's real market value. At the conclusion of trial, Defendant's representative stated that Defendant agrees that material defects exist in the subject property's built-in cabinetry and garage doors. In Defendant's view, a cost to cure of $30,000 was supported by the evidence. The court finds that Plaintiffs' evidence, including the construction contract and replacement quotes, supports a cost to cure of $40,000 to replace the built-in cabinetry and $12,000 to replace the garage doors, for a total cost to cure of $52,000. The court finds that the subject property's real market value, including the cost to cure defects, was $672,000 as of January 1, 2012.

### III. CONCLUSION

After carefully considering the testimony and evidence presented, the court finds that the real market value of the subject property, including the cost to cure construction defects, was $672,000 as of January 1, 2012. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account R2147313 was $672,000 for the 2012-13 tax year.

Dated this ___ day of January 2014.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed.*

*This document was signed by Magistrate Allison R. Boomer on January 21, 2014. The Court filed and entered this document on January 21, 2014.*